■ In the Matter of PETER G. and Others, Children Alleged to be Neglected. ANGELA G. et al., Appellants; ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent. [774 NYS2d 686]—

Orders of fact-finding and disposition, Family Court, New York County (Helen Sturm, J.), entered on or about September 14, 2000, insofar as it was found that respondents had neglected the subject children, reversed, on the law and the facts, without costs, the fact-finding determination vacated and the petition dismissed.

Sullivan, J., concurs in a memorandum as follows: In this child protective proceeding brought pursuant to article 10 of the Family Court Act, the parents appeal from orders of disposition, which, after a fact-finding determination that the parents neglected their children, released one of their children, Peter, to their custody, under certain conditions, with 12 months of

supervision by a child protective agency, social services official or a duly authorized agency.[1]

The petition charged the parents, Steven G. and Angela G., with neglecting their children, Peter, born February 22, 1990, Venitia, born May 7, 1992 and Demitri, born January 20, 1995, alleging that the father used excessive corporal punishment in that he disciplined the children with a belt and cane and caused injuries. After a fact-finding hearing, Family Court found that the father used excessive corporal punishment against Peter and that the mother knew or should have known of the excessive corporal punishment and failed to protect the child.

The case against the father consisted of the testimony of Ronna Rosen, employed by the New York City Board of Education as a school psychologist, who was qualified as an expert in child psychology "for the limited purpose of giving opinions about this matter," and Margaret Young, a caseworker for the Administration for Children's Services (ACS). On December 1 and 9, 1999, Dr. Rosen conducted a five-hour evaluation of Peter, who, without specifying how often this occurred, told her that the father disciplined him and Venitia by striking them with a cane[2] or belt. Dr. Rosen was unable to see any marks when Peter rolled up his pants to show where on his legs he had been struck. Peter described an incident in which his father struck him and Venitia while they were pinned between a table and wall. These incidents were usually a response to their being disobedient, for example, watching television without permission. After discussing the matter with the school principal, Dr. Rosen notified the State Central Registry because both she and the principal "thought that Peter felt he was in danger."

On December 21, 1999, Ms. Young, after receiving a report made through the State Central Registry, visited the G. home and spoke separately to each of the children. Venitia tearfully told Ms. Young that the father had struck Peter with a cane but denied that he had ever struck her with a cane. When Ms. Young asked Peter if he had ever been hit with a cane, he said "yes, [o]nly to his leg" and pointed to his right leg, just above the ankle. Ms. Young did not see any bruises. Peter also indicated that the father sometimes struck the bed with the cane, which he also used to pull the children towards him. Peter also stated that the father had threatened him with a belt; he did not indicate that he had ever been struck with the belt. Peter was

---

1. We are advised that the order of supervision has expired and was not extended.

2. Apparently, the father, as a result of certain physical problems, used a cane on occasion.

afraid of his father and concerned that he might hurt Venitia. Four-year-old Demitri told Ms. Young that he had not been hit with the cane but that he had seen Peter being hit.

Testifying for the mother, the children's maternal uncle, a New York City police officer, stated that over the past 10 years he had, on average, visited the G. home two evenings a week. He stated that he had a "[v]ery good, excellent" relationship with the children, none of whom ever complained to him about the parents or mentioned a cane. He stated that he "might have" seen the parents hit the children and that he had seen them discipline the children with "time outs." While the father had a tendency to yell at the children, the mother was the disciplinarian, a fact the mother confirmed. The mother also testified that the father had never struck the children except for an occasional spanking on the buttocks. The father testified that he never used a belt or cane to strike or discipline his children. At most, he used his bare hand to slap their buttocks. He further testified that Peter ignored his parents' directives.

Pursuant to Family Court Act § 1012 (f) (i), a finding of neglect requires proof that the child's "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired" as a result of the parent's failure "to exercise a minimum degree of care." Parents are entitled to use reasonable corporal punishment to maintain discipline (*see Matter of Anthony C.*, 201 AD2d 342 [1994]); they are guilty of neglect if they use "excessive corporal punishment" (Family Ct Act § 1012 [f] [i] [B]; *see* Penal Law § 35.10 [1] [a parent may use "physical force . . . when and to the extent that he reasonably believes it necessary to maintain discipline or to promote the welfare of (the child)"]). The petitioner has the burden of proving the allegations of neglect by a preponderance of the evidence (Family Ct Act § 1046 [b]; *Matter of Nicole V.*, 71 NY2d 112, 117 [1987]). "Unsworn out-of-court statements of the victim may be received and, if properly corroborated, will support a finding of abuse or neglect (Family Ct Act § 1046 [a] [vi])" (*Matter of Nicole V., supra* at 117-118). Although such statements may be corroborated by "[a]ny other evidence tending to support [their] reliability" (Family Ct Act § 1046 [a] [vi]), there is a "threshold of reliability that the evidence must meet" (*Matter of Zachariah VV.*, 262 AD2d 719, 720 [1999], *lv denied* 94 NY2d 756 [1999]).

Here, the evidence in support of the finding that the father inflicted excessive corporal punishment did not preponderate. The evidence, consisting mainly of Peter's out-of-court statements, made during an interview with a school psychologist and

repeated later to an ACS caseworker, was lacking in context, detail and specificity. Peter did not state the number of instances in which he was struck with a cane, that is, whether a single, isolated event or a common occurrence was involved, or how many blows were struck. He did not indicate how hard he was hit or whether he felt pain. Although Peter rolled up his pants to show where he had been struck, neither the school psychologist nor the ACS caseworker was able to see any bruises or other marks on his leg. Peter also told the school psychologist that the father struck him with a belt, but indicated to the ACS caseworker that the father had threatened, not struck, him with a belt. While repeated or a pattern of severe striking of a nine-year-old child with a cane or other object for minor offenses would rise to the level of excessive corporal punishment (*see e.g. Matter of Alena O.*, 220 AD2d 358 [1995] [severe beating with belt causing injuries]; *Matter of J. Children*, 220 AD2d 219 [1995] [repeated beatings resulting in injury with objects including leather belt or electrical cord]), no such evidence was presented here.

Nor were the statements of Venitia and Demitri any more probative. Venitia indicated to the caseworker that the father hit Peter with a cane, but provided no details as to when or how often this occurred, or, indeed, of any particular incident. Four-year-old Demitri merely stated in a general way that he saw Peter being hit. In light of the general nature of the children's statements and the lack of information as to the number or nature of the incident(s), it cannot be determined whether an isolated incident or repeated incidents were being described, whether the hitting was severe or even whether Peter was injured. Thus, the statements, taken at face value, do not support a finding of excessive corporal punishment (*see e.g. Matter of P. Children*, 272 AD2d 211 [2000], *lv denied* 95 NY2d 770 [2000]; *Matter of Charles J.*, 222 AD2d 439 [1995]; *Matter of Luke M.*, 193 AD2d 446 [1993]; *Matter of Damon S.*, 185 AD2d 850 [1992]).

Further undermining the finding of neglect is the lack of corroboration of Peter's statements. Although Peter repeated his statements to the school psychologist to the caseworker, the mere repetition is insufficient corroboration (*see Matter of Stephen GG.*, 279 AD2d 651, 653 [2001]). Nor, as noted, was there any physical evidence to corroborate Peter's statements. Neither the school psychologist nor the caseworker observed any bruises, welts or other marks when Peter displayed the area of his leg where he was allegedly struck. There was no evidence that the child's uncle, his teachers or anyone else in regular

contact with Peter ever noticed any marks on him consistent with being hit with a cane.

While children's statements can corroborate each other, the statements of Venitia and Demitri failed in that regard because, unlike those in *Matter of Nicole V.* (71 NY2d at 124 [statements of three brothers "tend to support the statements of the others and, viewed together, give sufficient indicia of reliability to each victim's out-of-court statements"; because each child "consistently and independently described . . . particularly detailed sexual acts, the reliability of the victim's out-of-court statements could be weighed by comparing them"]) and *Matter of Jessica DD.* (234 AD2d 785 [1996], *lv denied* 89 NY2d 812 [1997] [out-of-court statements regarding sexual abuse amply corroborated where child, by use of dolls, graphically reenacted the incidents for social worker, who testified that child exhibited behavioral problems common in sexually abused children]), they were too general to bear the mark of reliability. More to the point are *Matter of Jared XX.* (276 AD2d 980 [2000] [child's in-court testimony, lacking in detail and confusing, failed to provide necessary corroboration of out-of-court statements]) and *Matter of Kelly F.* (206 AD2d 227 [1994] [children's statements disagreed in important respects and each child, when confronted with the contradictions, accused the other of lying, held not cross-corroborative]).

Although, according to the caseworker, Venitia stated that the father struck Peter with a cane, her statement, like Peter's, lacked detail and specificity. Furthermore, it contradicted Peter's in an important detail, in that Peter said that both he and Venitia had been struck by the father while Venitia said that the father never struck her. In addition, the caseworker did not reveal Venitia's basis of knowledge, that is, whether Venitia saw the father strike Peter or whether Peter told her that he had been hit. Thus, Venitia's statement is as likely a repetition as it is a corroboration of Peter's statements. Although four-year-old Demitri stated that he saw the father hit Peter with his cane, his statement was extremely general.

Nor did the testimony of Dr. Rosen, the school psychologist, corroborate Peter's statements. Dr. Rosen was not qualified as an expert in child abuse and neglect but, rather, as noted, as an expert in child psychology "for the limited purpose of giving opinions about this matter." She testified primarily as a fact witness in reporting Peter's statements. Her opinion that Peter was truthful because he did not contradict himself over the course of a five-hour evaluation merely vouched for his credibility and did not provide the requisite corroboration of his out-

of-court statements (*see Matter of Tomas E.*, 295 AD2d 1015, 1019 [2002]; *Matter of Kelly F.*, 206 AD2d 227, 229 [1994]).

Even assuming that the burden of proving that the father struck Peter with a cane has been met, there has been no showing that the father used more force than was reasonable. It is important that we not lose sight of a parent's common-law privilege to use reasonable physical force to discipline his or her children (*Matter of Rodney C.*, 91 Misc 2d 677 [1977]; Restatement [Second] of Torts § 147), which has been codified in New York (Penal Law § 35.10 [1]; Family Ct Act § 1012 [f] [i] [B]). In this case, there was no evidence of bruising or injury of any kind, and, while there was testimony that the father became angry, there was no showing that the father's actions were extreme or unnecessarily degrading or prompted by rage or administered solely for self-gratification (*see Matter of Rodney C.* at 681).

Nor may the neglect finding against the father be sustained on the ground that Peter suffered emotional rather than physical harm (*see* Family Ct Act § 1012 [f] [i] [B]). That ground was never charged in the petition, which alleged that the father inflicted excessive corporal punishment. The claim of emotional harm was raised by petitioner for the first time in its written summation and was objected to on the ground that the father never had the opportunity to address it. It should not be considered on appeal.

Given the lack of evidence to support the finding against the father of using excessive corporal punishment, the finding of neglect against the mother cannot be sustained. In any event, even if the evidence against the father were sufficient, there is no support for the finding that the mother knew or should have known of the father's conduct and failed to protect Peter. The only evidence in that regard is an uncorroborated out-of-court statement by Peter, which is legally insufficient.

Thus, the orders, insofar as it was found that respondents had neglected their children, should be reversed and the petition dismissed.

Lerner and Marlow, JJ., concur in a separate memorandum by Marlow, J., as follows: We agree that the neglect finding against respondent mother is unwarranted by the proof, and it should therefore be reversed and the petition dismissed as to her.

Although the issue involving respondent father is not as clear, the neglect finding against him must also be reversed. While the agency adduced evidence suggesting that he used a cane to discipline at least the two older of his three children, the

quantity and quality of that evidence fail to meet the required standards set by Family Court Act § 1012 (f) (i), § 1012 (f) (i) (B) and § 1046 (b), a conclusion the children's law guardian urges on appeal.

In reaching this conclusion, we emphasize and fully appreciate that the decision of a Family Court judge who saw the witnesses and heard them testify generally should be accorded great deference due to the obvious, superior opportunity a trial judge has to evaluate the words, motives, intelligence, maturity and demeanor of each witness. However, there are cases, such as this one, when that wise and long-standing policy must give way to a studied, contrary assessment by an appellate tribunal.

The instant case must not be misconstrued as a controversy over whether a parent's use of a cane—however inconsequential—to discipline a child is appropriate, desirable or lawful. That is not the issue we are required to decide. Rather, we are presented with the legally routine, limited question of whether the finding appealed is supported, on this particular record, by a preponderance of credible, i.e., reliable, evidence that this father "unreasonably inflict[ed] . . . harm, or a substantial risk thereof, [by] the infliction of excessive corporal punishment" (Family Ct Act § 1012 [f] [i] [B]).

A reading of this record can evoke an impression that these parents, whose lives are apparently complicated by health and other issues, have created a somewhat chaotic family environment for themselves and their children, a situation that perhaps adds difficulty to an accurate assessment of this evidence. Moreover, one who analyzes the testimony can reasonably suspect that both parents are, for whatever the reason, overwhelmed by their circumstances. Furthermore, the evidence, such as it is, can rationally lead one to believe that the father's style of discipline is inappropriate, impatient, at times unnecessarily frightening, or simply that it is inconsistent with modern styles and notions of child rearing. However, notwithstanding any of those beliefs, none of them, based on the proof on this record, would establish neglect as the law defines it in the above-cited statutes.

The agency alleges that the father threatened to hit his children with a cane, that he did so, and that his doing so caused injuries. The agency's case rests principally on hearsay testimony which we find too weak and nonspecific to justify a neglect finding under the law, because there is inadequate *clear and reliable* evidence, either direct or hearsay, revealing and corroborating the frequency or severity of the conduct at issue or that there was any resulting bruise or other injury.

While surely a finding of neglect can, under certain circumstances, rest on reliable evidence that does not include actual physical injuries or bruises, we would emphasize that their absence must be regarded as a relevant, albeit not a controlling, factor in the context of evidence like this, which is otherwise weak and lacking in specificity.

The concurring and dissenting opinions have made strong presentations for their respective positions. In the final analysis, however, we believe there is simply no reliable way for us to conclude from these children's somewhat inconsistent hearsay versions, as given through the school psychologist and the Administration for Children's Services caseworker, that the father did anything beyond a physically inconsequential, nonsevere striking of one or two of the three children, on no more than one occasion, with a cane. While there is some cross-corroboration of each child's hearsay statements, which would often be sufficient to support a finding of neglect (*Matter of Nicole V.*, 71 NY2d 112, 124 [1987]; *Matter of Tylena S. v Darin J.*, 4 AD3d 568 [2004]), the lack of specificity and the partial, internal inconsistency of the children's statements herein render them too weak to be relied upon, especially without any other confirming evidence. We therefore hold that the neglect finding against the father must also be reversed and the petition dismissed as to him.*

Mazzarelli, J.P., and Ellerin, J., dissent in part in a memorandum by Ellerin, J., as follows: I would affirm the finding against the father on the grounds that the children's statements cross-corroborate each other and the evidence as a whole preponderates against the father.

Peter told the school psychologist that his father uses a cane and a belt to discipline him and his siblings. Pointing to his leg, he said, "I have bruises here if I do something bad." He told her that when his father threatens the children with the cane, "we have to run away, [he] has red in his eye." He said, "Sometimes I don't think we did anything—always threatens with the cane." Peter said his mother "sometimes gets very mad at him because he is threatening us with the cane. So she is trying to be on our side." He said she screams at the father

---

* In rendering this opinion, we would add that we do not in any way intend to criticize or minimize the dissent's belief that the evidence proves the greater level of corporal punishment by the father legally required to meet the preponderance standard under Family Court Act § 1046 (b) (i). However, in our judgment, that extra step simply cannot be reliably reached on the basis of the quantity and quality of this proof viewed in a light most favorable to the agency.

not to hit them with his cane. Peter related an incident in which his father trapped him and Venitia behind a table and struck them with his cane. He said that two days before the interview with the school psychologist, his father had hit Venitia on the leg with his cane. Peter expressed anxiety over Venitia's welfare and his father's inability to control himself when disciplining her. He said, "He's so mad, he's controlling himself, when really mad hits her." He described his family as a "hitting family." In his interview with the Administration for Children's Services (ACS) caseworker, Peter said his father hits him on the leg with the cane. He said he was frightened of his father, frightened that his father would hurt Venitia.

The psychologist, who was qualified as an expert in child psychology for the purpose of giving opinions about this matter, testified that she called the State Central Registry after interviewing Peter because she thought that "Peter felt he was in danger."

Both Venitia and Demitri, in separate interviews, told the ACS caseworker that their father hits Peter with his cane. When asked whether she ever was afraid of her father, Venitia said that he gets angry and "red in his eye." She also said that sometimes he tries to control himself but cannot.

The Family Court Act provides that a child's out-of-court statements relating to any allegations of neglect are admissible in evidence but not, if uncorroborated, sufficient to make a factfinding of neglect (§ 1046 [a] [vi]). However, such statements may be sufficiently corroborated by "[a]ny other evidence tending to support the reliability of the previous statements, including, but not limited to the types of evidence defined in this subdivision" (id.). Thus, independent statements requiring corroboration may corroborate each other (see Matter of Nicole V., 71 NY2d 112, 124 [1987] ["The statements of each of the three brothers in this proceeding tend to support the statements of the others and, viewed together, give sufficient indicia of reliability to each victim's out-of-court statements"]). Considerable discretion is vested in the Family Court to determine whether a child's out-of-court statements describing incidents of neglect have been reliably corroborated and whether the record as a whole supports a finding of neglect (id. at 119).

I see no error in the court's determination that Peter's statements that his father hits him with a cane were reliably corroborated by Venitia's and Demitri's independent statements that their father hits Peter with his cane. The children's statements were neither confusing nor lacking in the kind of detail that would cast doubt on their assertion that the father uses his

cane on Peter. Moreover, both Peter and Venitia described their father as having "red in his eye" when angry, and both said he had difficulty controlling himself when angry. The cases cited in Justice Sullivan's concurring opinion as being "[m]ore to the point" here are in fact inapposite. In *Matter of Jared XX.* (276 AD2d 980 [2000]), the five-year-old child's in-court testimony was held insufficiently reliable to corroborate his out-of-court statement to his mother that his father had played with his penis. "Although Jared testified that respondent fondled him while the two were taking a shower and that he had not imagined the incident, he was able to provide few specific details and responded negatively when asked if he knew 'the difference between imagined things and things that really happened' " (*id.* at 982). In *Matter of Kelly F.* (206 AD2d 227 [1994]), one of the two girls whom their mother's paramour was accused of sexually abusing denied that she had been abused, and each of the girls, when confronted with the inconsistencies in their stories, accused the other of lying. Moreover, there was expert testimony that the sexual knowledge displayed by the girl who said she was abused was age-appropriate and that she admitted having fabricated allegations of abuse against other individuals.

The instant record also supports the court's conclusion that the credible evidence preponderated against the father. The court heard the testimony of both parents as well as the school psychologist and the ACS caseworker. Steven G. denied that he uses his cane to discipline the children and Angela G. said that she has never seen him use it for that purpose. Angela testified that both she and Steven spank the children's buttocks with their hands. However, she also testified that she has asked Steven many times to leave the home when they have been arguing and that the manner in which he disciplines the children is one of the issues she has raised with him on those occasions.

Steven testified that Peter has "a pattern of not listening" and he has to be asked "continuously" to do something. He acknowledged that Peter has special education needs; Peter is in the fourth grade but reads at only a second- or lower third-grade level. "The fact remains," Steven continued, "that he's a child that wants a lot of attention, and, also, needs it, so the idea is that he—he's not a child that's a normal child, that listens all the time. In this regard, he's not, disciplinarian-wise he doesn't listen. He simply does not listen."

Steven further testified that he and Angela learned the expression, "red in the eye," in a conflict resolution course they attended and that it referred to "when you know you have

anger, and you're yelling and shouting." He said, "[T]hey try to tell you how to, actually, realize that you're in that mode, and what you should do, things you should do when you're at that time. Take a rest. Those kinds of things." He said that he was taking these courses because he is not "trained to handle" Peter.

"A parent certainly has the right, indeed, it is his duty, to correct any act of misconduct on the part of his child. The form of correction is the question to be passed upon" (*Matter of Carl*, 174 Misc 985, 986 [1940]). Recognizing a parent's common-law privilege to use reasonable physical force to discipline his children, we are concerned with "the dimensions of reasonable parental use of physical force" (*Matter of Rodney C.*, 91 Misc 2d 677, 680 [1977]). Punishment is not reasonable if the means by which it is administered are not moderate, if it is more severe than other equally effective available means, or if it is "unnecessarily degrading," "brutal" or "protracted beyond the child's power of endurance" (*id.* at 681 [internal quotation marks and citation omitted]). The principle underlying these considerations is that the use of physical force by a parent is privileged only when its purpose is the training or education of the child or the preservation of discipline, and only if the child has the capacity to understand or appreciate the correction (*id.* at 680-681). Measured against these standards, "force administered for the gratification of passion or rage is excessive punishment" (*id.* at 681 [internal quotation marks and citation omitted]).

In the instant case, the court apparently found both parents less than credible on the subject of Steven's caning of Peter. In matters such as this, the nisi prius court's findings must be accorded the greatest respect (*Matter of Irene O.*, 38 NY2d 776, 777 [1975]). I must note, however, that even without the benefit of that court's superior vantage point (*see id.* at 778), I find that the cold record alone transmits the picture of an enraged father, unable to control himself, reaching for his cane and lashing out at his son, who does not always understand what has put the "red in his [father's] eye." Steven's denial that he ever raises his cane to Peter fails to dispel this picture. Indeed, the remainder of Steven's testimony helps to complete it. Moreover, Angela's testimony that she has often taken issue with the manner in which Steven disciplines the children tends to confirm the children's statements. Thus, the court's finding that Steven uses excessive corporal punishment against Peter should be affirmed.